IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,   )   No. 1:18-cv-01568-TNM
                                              )
          Plaintiffs,                )   DECLARATION OF GARY FRAZER
                                              )
          v.                         )
                                                )
RYAN ZINKE, et al.,                 )
                                              )
          Defendants.             )
                                              )
_____)

I, Gary Frazer, state the following:

1. I am the Assistant Director (AD) for the Ecological Services Program of the U.S. Fish and Wildlife Service (Service), an agency of the U.S. Department of the Interior (Department), located in Washington, D.C. In my capacity as AD, I am responsible to the Director of the Service and to the Secretary of the Department for, among other things, the administration of the Endangered Species Act (ESA), 16 U.S.C. § 1531-1544, including determinations about whether species should be listed as threatened or endangered under the ESA and critical habitat designations for ESA-listed species.

2. In my capacity as AD, I oversee ESA domestic species listing and critical habitat workload planning, which includes related budget allocation decisions. I also review species petition findings, listing determinations, and critical habitat designations as they pass through the Service's Headquarters for final decision, and participate in Departmental briefings on the packages for clearance to publish in the Federal Register.

3. I submit this declaration in support of Defendants' position on remedy in this matter.

**Status of Critical Habitat Designations for the Four Mussel Species**

4. I am familiar with the current matter, in which I understand, through staff informing me, that the plaintiff is alleging that we missed statutory deadlines to make critical habitat designations for four mussel species: the rayed bean, snuffbox, sheepnose, and spectaclecase. It is also my understanding that we listed the rayed bean and snuffbox as

1

endangered species on February 14, 2012, but did not designate critical habitat at that time because we found it was not determinable. 77 *Fed. Reg.* 8632. Further, I understand that we listed the sheepnose and spectaclecase as endangered species on March 13, 2012, but also found that critical habitat was not determinable. 77 *Fed. Reg.* 14914. To date, we have not made critical habitat determinations for any of the four mussels.

5. At the time of the final listings, we were carrying out commitments under multi-district litigation settlement agreements with this plaintiff and another environmental group to make several hundred other petition findings, listing determinations, and critical habitat designations within a 6 year span. *In re: Endangered Species Act Section 4 Deadline Litigation*, No. 1:10-mc-00377-EGS, MDL Docket No. 2165 (D.D.C. May 10, 2011). While the listing actions for the four mussels were required by one of the two settlement agreements, neither settlement agreement specifically obligated the Service to designate critical habitat for these mussels during the years in which we were carrying out our commitments under those settlement agreements. Simply put, we did not make progress on the critical habitat designations for the mussels during that time because our workload was full and our budget was at capacity; we did very few discretionary actions during that time.

6. Since completing the work required by the multi-district litigation settlement agreements, our statutory obligations for petition findings, listing determinations, and critical habitat designations continues to far exceed the resources we have to complete them. Therefore, we must make reasoned choices on what the highest priority actions are. We have continued to focus on high-priority, outstanding 12-month listing petition findings, proposed and final listing rules to effectuate positive petition findings, and high-priority critical habitat designations. Our highest priorities are reflected in the National Listing Workplan for fiscal years 2017-2023 and on step-down workplans per fiscal year.

7. As explained further below, these critical habitat determinations for the four mussels are currently not among our highest priorities.

**Background Information on the Four Mussel Species**

8.  These four mussel species occur in streams in the Midwest and eastern United States. The sheepnose lives in larger rivers and streams, usually in shallow areas with moderate to swift currents and coarse sand and gravel, although it has also been found in mud, cobble, and boulders and in deep runs of large rivers. The spectaclecase occupies large rivers in areas sheltered from the main force of the current and clusters in firm mud or beneath rock slabs, between boulders, or under tree roots. The rayed bean generally lives in smaller, headwater creeks but is sometimes found in large rivers and wave-washed areas of glacial lakes; it prefers gravel or sand substrates and is often found in and around roots of aquatic vegetation. The snuffbox usually occupies small- to medium-sized creeks with a swift current and sand, gravel, or cobble substrates, although it is also found in Lake Erie and some larger rivers.

9.  Threats that have contributed to the decline of these four mussel species include dams, sedimentation, pollution, channelization, nonnative species, and small population size and fragmentation. Dams affect both upstream and downstream mussel populations by disrupting natural seasonal flow patterns, scouring river bottoms, changing water temperatures, eliminating habitat, and blocking passage for host fish. Sedimentation can occur from poor land use practices, dredging, impoundments, intensive timber harvests, road construction, heavy recreational use, and other activities. These increased sediments blanket a river bottom, suffocating mussels by reducing their ability to remove food and oxygen from the water column. Pollution may come from specific, identifiable sources, such as accidental spills, factory discharges, sewage treatment plants, and landfills, or from diffuse sources like runoff from cultivated fields, pastures, feedlots, poultry farms, mines, construction sites, private wastewater discharges, and roads. Contaminants may directly kill mussels, but they may also indirectly cause harm by degrading water quality. Channelization physically alters rivers by accelerating erosion, reducing depths, decreasing habitat diversity, destabilizing stream bottoms, and removing riparian vegetation. Nonnative species include the zebra mussel, which has proliferated to such an

3

extent that they deplete food resources and attach to native mussel shells in such large numbers that the native mussel cannot open its shell to eat or breathe. Small populations, isolated in short sections of rivers, are susceptible to extirpation from a single catastrophic event, such as a toxic spill, and their isolation makes natural repopulation impossible.

10. Section 7 of the Endangered Species Act requires Federal agencies to consult with the Service to ensure Federal actions are not likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat. Pursuant to Section 7, Federal agencies have consulted with our field offices on Federal actions that may affect one or more of these four mussel species. Because these species occur in rivers and streams that have typically been under the jurisdiction of section 404 of the Clean Water Act, the U.S. Army Corps of Engineers has consulted with us on issuance of 404 permits for in-stream activities that may affect one or more of these four mussel species. The U.S. Army Corps of Engineers would not have consulted on these projects absent the listing of these species. Federal agencies have initiated consultation when one or more of these four species has been present within the action area. If we were to designate areas occupied by these species as critical habitat, we do not anticipate significant additional conservation benefits from consultation because project modifications to avoid the likelihood of destruction or adverse modification of critical habitat generally do not differ significantly from project modifications needed to avoid the likelihood of jeopardy. In sum, because these four mussel species are listed as endangered species, Federal agencies and parties seeking Section 404 permits are already acting through Section 7 consultations to conserve the mussels; we anticipate that designating critical habitat would result in little additional conservation benefit.

11. Similarly, because the mussels are listed, any take prohibited under Section 9 of the ESA that is incidental to an otherwise lawful activity of a non-Federal party requires a Section 10 permit. The issuance of a Section 10 permit by the Service requires that applicants minimize and mitigate, to the maximum extent practicable, the impact of the taking. Critical habitat designations do not require anything of non-Federal parties unless there is

a Federal nexus – they are not barred from destruction or adverse modification of critical habitat like Federal agencies are – so critical habitat designation for the mussels will not provide any additional protection from incidental take by non-Federal parties over and above the listing.

12. Critical habitat designations for the mussels will provide limited additional conservation value. For this reason, we consider making petition findings and listing species for which ESA protection is warranted to be a higher priority for us than designating critical habitat for these already-listed species.

**Legal Requirements for Critical Habitat Designations**

13. Critical habitat must be designated concurrent with a listing determination "to the maximum extent prudent and determinable." 16 U.S.C. § 1533(a)(3)(A). Our regulations at 50 C.F.R. § 424.12 explain our interpretation of "prudent" and "determinable." We consider critical habitat to be not determinable if we do not have sufficient information to assess the impact of the designation, or if we do not have sufficient biological information on the species' needs, at the time that we make a listing determination.

14. The ESA provides that we may designate as critical habitat specific areas that are occupied at the time of listing and that have "physical and biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection." 16 U.S.C. § 1532(5)(A)

15. It also provides that we may designate areas that are unoccupied at the time of listing if we determine that the "areas are essential for the conservation of the species." *Id.*

16. We must designate critical habitat "on the basis of the best scientific data available and after taking into consideration the economic impact, the impact on national security, and any other relevant impact, of specifying such area as part of the critical habitat." 16 U.S.C. § 1533(b)(2).

17. The ESA also allows us to exclude specific areas from critical habitat designations "if the benefits of such exclusion outweigh the benefits of specifying such area as part of the critical habitat, unless . . . failure to designate . . . will result in extinction." *Id.* In practice,

existing conservation agreements, tribal equities, economic impact, and national security are all potential factors we consider in an exclusion analysis, as well as the conservation value of the area.

18. We publish proposed critical habitat rules in the *Federal Register*, as the ESA requires. 16 U.S.C. § 1533(b)(5)(A). It also requires that we publish final critical habitat rules at the time of publishing final listing rules, unless at that time critical habitat is not determinable, in which case we may extend the time by one year. 16 U.S.C. §§ 1533 (b)(6)(A)(ii), (b)(6)(C).

**Process for Designating Critical Habitat and Policy Clearance for Rules**

19. Designating critical habitat, when it is found to be prudent and determinable, involves many steps, some of which are science-based and some of which are policy-based. I outline these steps generally in the following paragraphs. Generally, it is our goal to propose critical habitat with proposed listing rules and to finalize them concurrently. Because we have already listed the mussels, the process will be different than if we had done it with the listing.

20. Otherwise, a team of staff biologists will identify physical and biological features (PBFs) that may require special management considerations or protection and that are essential for the conservation of the species. For example, for a mussel species, some PBFs might be water of certain quality (e.g., temperature, clarity, flow rate), certain substrates in the streambed, and fish hosts necessary for successful reproduction. *See, e.g.,* Designation of Critical Habitat for the Carolina Heelsplitter, 67 *Fed. Reg.* 44502, 44509 (July 2, 2002). Then the team will look for and identify areas that contain the PBFs and that are occupied by the species. It will also consider unoccupied areas that are essential for the conservation of the species.

21. During the process of developing the determination, we coordinate with other federal agencies to ensure that they are aware that we are working on the determination and we provide them an opportunity to share any relevant information. Such information may include data about the species, conservation measures being implemented, activities that

may affect the species or habitat, and the anticipated effects of the designation on their activities.

22. Once the team has identified areas to recommend as critical habitat, it also must follow the direction in the statute to consider economic and other factors in the designation. For the economic analysis, we prepare an incremental effects memorandum, which describes how the FWS will implement the critical habitat designation and the anticipated effects of the designation, informed by the information we have gathered from other federal agencies. This information is provided to a contractor, who produces an analysis of the economic impact of the critical habitat designation on local jurisdictions, landowners, and the local economy because of the designation. The economic analysis will only identify and analyze impacts over and above the economic impacts of the listing, or the "incremental" effects estimated to be incurred as a result of the designation. The contractor will provide the analysis within 6 weeks after receiving all necessary information from us.

23. The team may also identify any specific areas should be considered for exclusion from the designation based on national security, economic, or other impacts. Next, members of the team and some Headquarters staff will brief decisionmakers in the Servcie on their recommendation. Staff must then draft the actual *Federal Register* notice for the determination.

24. Once the notice is drafted, it moves through regional review from the staff level to the Regional Director, as well as legal review by an attorney in the Regional Solicitor's office. It then comes to Headquarters for review by the Branch Chief for Domestic Listing and the Chief of the Division of Conservation and Classification. Next, I surname as Assistant Director for Ecological Services before transmitting the rule to the Service Director, who has signature authority for ESA determinations, for final decision.

25. Following the Service Director's signature, the rule will move to the Assistant Secretary for Fish and Wildlife and Parks and, finally, to the Executive Secretariat for final clearance to send the document to the *Federal Register*.

26. The Office of Management and Budget (OMB) has the opportunity to review proposed and final critical habitat rules as described by EO 12866. OMB can also initiate federal interagency review if they choose. This adds time to the process. If OMB reviews or reviews and initiates interagency review, the rule cannot be submitted to the Federal Register for publication their review is complete.

27. A few days will likely pass between submission of a rule to the *Federal Register* and actual publication. We cannot control when the Office of the Federal Register will schedule a submission for publication, and so we ask that if this Court assigns a deadline to these actions, that it order us to submit the findings to the *Federal Register,* rather than to publish the findings, by a date certain.

28. The minimum time for policy review from the time a rule arrives in Headquarters to the time the rule is cleared for publication is three months. The team must take this into account when working on the rule and must also allow time for briefing regional leadership and senior policy officials. During this time, too, the economic analysis must proceed and be completed so that the information can inform the proposed rule.

29. Once a proposed rule publishes, the public comment period opens, which is typically 60 days. At the close of the comment period, we must consider the comments; decide whether we have any new, substantial information that would require another comment period; and draft the final rule. We repeat the same briefing and clearance processes for the final rule, including the three months for Headquarters review and clearance.

30. We strive to meet the statutory deadlines for proposed and final critical habitat designations. Some of the steps, including the economic analysis and coordination with other federal agencies, are resource and time-intensive. Given the processes above and considering the timelines in the ESA, we need approximately one year to prepare a proposed critical habitat designation, plus one year to complete a final designation.

**The Service's Budget for the Listing Program**

31. Our Fiscal Year 2018 appropriation was about $18.8M for status assessments, petition findings, listing determinations, critical habitat designations, and related activities. We are

1  currently working under a continuing resolution, which allows us to spend funds for
2  operations on continuing projects and activities at the rate that was authorized for Fiscal
3  Year 2018. This authorization expires on December 7, 2018, or when Congress passes an
4  appropriation bill, whichever is sooner. P.L. 115-245. Thus, we do not know what our
5  appropriation will be for the rest of Fiscal Year 2019.

6  32. Specifically, the Fiscal Year 2018 appropriations law, P.L. 115-141, stated, "not to exceed
7  $18,818,000 [of the Service's appropriation] shall be used to implementing subsections
8  (a), (b), (c), and (e) of section 4 of the Endangered Species Act of 1973 (16 U.S.C. 1533)
9  (except for processing petitions, developing and issuing proposed and final regulations,
10  and taking any other steps to implement actions described in subsection (c)(2)(A),
11  (c)(2)(B)(i), or (c)(2)(B)(ii))."

12  33. By contrast, in 2016, when we created the National Listing Workplan, our appropriation
13  was $20,515,000. P.L. 114-113. The National Listing Workplan was built on an
14  assumption of stable resources.

15  **The National Listing Workplan**

16  34. In 2015-2016, as the multi-district litigation-driven workload concluded (see paragraph 5,
17  above), we undertook comprehensive domestic listing and critical habitat workload
18  planning, our motivation being to be more strategic in addressing pending status reviews,
19  to be more transparent in how we establish workload priorities, and to collaborate with
20  stakeholders more effectively to conserve the nation's most imperiled species.

21  35. In July 2016, we finalized our Methodology for Prioritizing Status Reviews and
22  Accompanying 12-Month Findings on Petitions for Listing under the Endangered Species
23  Act, 81 Fed. Reg. 49248 (July 27, 2016). The Methodology explains how we will
24  prioritize outstanding 12-month listing petition findings, and it informed the development
25  of our National Listing Workplan (Workplan) for fiscal years 2017-2023. Specifically, we
26  used the Methodology to prioritize the 12-month findings on the Workplan by placing
27  them in one of five priority "bins" that indicate our view of the species' conservation

28

status, how much information we have on the species and whether new science is being developed, and whether there are currently conservation efforts underway.

36. The Workplan, which we released in September 2016, scheduled more than 350 pending listing determinations over seven fiscal years. A large majority of the actions on the Workplan are 12-month petition findings, while some are proposed listing determinations or discretionary status reviews. The Workplan does not include the sum total of actions that contribute to our total workload; for instance, the Workplan will schedule a 12 month finding on a petition to list a particular species, but it will not forecast and include the proposed and final listing determinations and proposed and final critical habitat designations that may be necessary if a listing proposal is found to be warranted. Nor does it contain actions on any new petitions received or some remnant actions from the multi-district litigation period, including lower priority proposed and final critical habitat designations for species we listed during that period, such as those for these four mussel species

37. The Workplan is available on our website (https://www.fws.gov/endangered/esa-library/pdf/Listing%207-Year%20Workplan%20Sept%202016.pdf), along with a list of unscheduled listing actions dated September 2016. We plan to post updated versions of the Workplan each fiscal year that will project our listing workload five years into the future, along with a stepped-down version of the Workplan that has all of the planned actions for the current fiscal year.

38. In September 2016, when we assigned dates to findings in the Workplan, we assumed level funding at 2016 levels ($20.5M) and the 2016 level of full-time employees. Because we do not have the amount of funding that we did in 2016, nor do we have the number of full time employees ("FTEs") that we did then, we have less capability than we assumed when we built the current Workplan.

**The Service's Upcoming Domestic Listing and Critical Habitat Workload**

39. As of September 2016, the Workplan captures the following 12-month findings and proposed listing determinations:

   a.  2019 – 58 species in 44 packages

   b.  2020 – 78 species in 42 packages

   c.  2021 – 47 species in 36 packages

   d.  2022 – 38 species in 31 packages

   e.  2023 – 46 species in 41 packages

40. For any of these findings that indicate we should list a species (i.e., a 12-month petition finding that listing a species is warranted), we will undertake rulemaking to propose the species for listing. We also plan to undertake the critical habitat designation concurrently with proposed and final listings. While we cannot currently predict how many proposed and final listing and critical habitat rules we will need to complete in all of these fiscal years, we know from experience that at least some of our 12-month findings will indicate that listing is warranted. These follow-on rules will contribute to the actual workload for the following year.

41. Beyond 2023, we already have a list of unscheduled listing actions to address, as referenced above. We also periodically receive new petitions and expect that to continue. New petition work will be included in the workload as they fit with our conservation priorities and workload.

42. Historically, the Service has experienced a significant level of deadline litigation, like this matter. Such deadline litigation usually results in a stay, settlement, or court order providing a date certain by which we must complete the finding in question. The Service currently has about 20 litigation-related listing and critical habitat deadlines it must meet. Moreover, when we lose a listing or critical habitat case on the merits, courts generally remand the findings to us and sometimes enter an order with a date certain for the new finding. We cannot predict the level of future deadline and merits litigation, nor the outcomes of merits cases, so we cannot know how many more litigation-related regulatory deadlines may be added to our workload in coming fiscal years. However, we can safely predict that we will experience more deadline and merits litigation.

**Requested Remedy and Justification**

43. The Service requests that the Court take into account the Service's limited budget, its high workload, its prioritization of its workload, and the comparatively low conservation benefit of designating critical habitat for these species when making its decision on remedy in this matter.

44. First, as outlined above, the Service has a limited and declining budget for the listing program that it must share across all of its listing workload.

45. At the same time, the Service has a high workload for the national listing program in upcoming years, and we do not see this decreasing. If anything, we expect more work will result from new petitions and litigation. In addition, much of this work will be higher priority than the critical habitat determinations for the mussels in that, as stated above in paragraph 12, listing new species provides a greater conservation value than designating critical habitat for already-listed species. The litigation-driven workload must also take priority.

46. According to the 2016 National Listing Workplan, Region 3 has 17 listing packages to complete by the end of fiscal year 2023. The two Region 3 biologists who work only on listings and critical habitat designations are expected to assist on findings and critical habitat determinations in other regions that have higher workload. Other biologists assigned to listing and critical habitat packages in Region 3 have other responsibilities, including five-year reviews, Section 7 consultations, recovery planning and implementation, and Section 10(a) permits. In any event, all work completed at the Regional level contributes to the Headquarters workload; adding to Region 3's workload necessarily adds to Headquarters workload.

47. The Service specifically requests that the Court grant it deference regarding its prioritization of actions in its workload. Using the Methodology and other means to assign priority to actions in its workload, the Service intelligently and expertly determined, based on elements in the Methodology such as conservation need and regional and field office capacity, where these actions should rank in its Workplan. The Service is the expert

12

1   agency tasked with making listing determinations and critical habitat designations under

2   the ESA and is thus best positioned to allocate its scarce resources to address a high

3   workload in a manner that achieves the optimal conservation benefit.

4   48. The four mussel species' critical habitat designations are low priority actions for the

5   Service because the additive conservation benefit of critical habitat designation is low in

6   this particular case, as explained above in paragraphs 10-12. Additionally, the critical

7   habitat designation process, especially the interagency coordination and economic

8   analysis, is burdensome and resource-heavy; these resources are better used where they

9   can have a greater conservation impact.

10  49. Ideally, the Service would complete these critical habitat determinations after it works

11  through higher priority actions that are on the current Workplan, which ends in 2023, and

12  after it addresses another approximately 200 species that are on the unscheduled listing

13  actions list, also on our website (https://www.fws.gov/endangered/esa-

14  library/pdf/Unscheduled%20Listing%20Actions%20Sept%202016.pdf).

15  50. The documents in the attached exhibit support this declaration.

16  51. This declaration is made under the provision of 28 U.S.C. § 1746.  I declare under penalty

17  of perjury that the foregoing is true and correct to the best of my current knowledge,

18  information, and belief.

19

20  Executed in Washington, D.C., on this 16th day of November 2018.

21

22

23  _____

24  Gary Frazer
    U.S. Fish and Wildlife Service

25

26

27

28

13